O

UNITED  STATES  DISTRICT  COURT

FOR  THE  CENTRAL  DISTRICT  OF  CALIFORNIA

| | | |
|---|---|---|
| TARGET TECHNOLOGY COMPANY, LLC, | ) ) ) | CASE NO. SACV 04-1083 DOC (MLGx) |
| Plaintiff(s), | ) ) | |
| v. | ) ) | O R D E R [1] DENYING TARGET AND NEE'S MOTION FOR |
| WILLIAMS ADVANCED MATERIALS, INC., et al., | ) ) ) | SUMMARY JUDGMENT; [2] DENYING SONY'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AND [3] DENYING THE WILLIAMS |
| Defendant(s). | ) ) | DEFENDANTS' MOTION FOR RECONSIDERATION |
| | ) ) ) ) ) ) ) | |
| _____ | ) | |

Before the Court are the following motions: 1) Target Technology Company, LLC ("Target") and Han Nee's ("Nee") Motion for Full Summary Judgment Barring Sony Parties' Second Amended Complaint in Intervention on Grounds of Statute of Limitations (the "Target MSJ"); 2)  Sony DADC US Inc.'s ("DADC") Motion for Partial Summary Judgment (the "Sony MSJ"); and 3) The Williams Defendants' Motion for Reconsideration (the "Motion for Reconsideration").  After considering the moving, opposing and replying papers, as well as the parties' oral argument, and for the reasons set forth below, the Court hereby ORDERS as follows:

## **BACKGROUND**

In 1988, Nee began working for the CBS Records' research lab. At around the same time Sony acquired CBS Records.

In 1991 Nee attended a Sony engineering conference, where he met Shiro Koike ("Koike"). Koike then asked Nee's supervisor if Nee could work for a short period in Japan to solve a few production problems. Nee then learned that the CBS Records' lab was closing. Koike offered Nee a job with Sony Japan.

Nee traveled to Japan in July 1991 for an interview with Sony Corp. and, following this trip, engaged in extensive employment negotiations with Sony. The parties contemplated that Nee would spend a significant period at Sony Corp. subsidiary Sony Disc Technology ("SDT") in Japan and return to DADC upon completing this assignment. DADC hired Nee on January 9, 1992 for a short period while he awaited Japanese visas. Nee insisted that his name be kept in the DADC organization while he was in Japan and that he be able to return to DADC after leaving SDT. Nee some evidence that DADC merely agreed to consider re-hiring Nee when he returned from Japan and did not guarantee this employment.

During Nee's time in Japan, DADC continued to pay a portion (10-20 percent) of Nee's salary and provide him with 401k and other benefits. DADC was required to pay a portion of Nee's salary in order for Nee to contribute to his 401k. Accordingly, DADC paid a portion of Nee's salary and sought reimbursement from Sony entities in Japan. Further, DADC paid for Nee and his family's business-class airfare when they visited the United States. DADC also kept Nee's name in the DADC organization.

On January 8, 1992, Nee signed an "Employee Patent and Confidential Information" agreement with DADC (the "January 1992 Agreement"). This agreement assigned to DADC all rights in patents invented by Nee during his period of employment, as follows:

> I hereby assign and agree to assign without further compensation, to
> DADC or its designee, my entire, right, title and interest in and to
> each invention technological innovation, including all rights to

1           obtain, perfect and enforce patents and other proprietary interests

2           therein, in which I participate during the period of my employment

3           with DADC, whether or not during working hours, which pertain to

4           any line of work or investigation by DADC or is aided by the use of

5           time, material, or facilities of DADC, or in which DADC expresses

6           an interest.

7 Such a provision is considered an automatic assignment of a right in a future interest. *DDB*

8 *Techs v. MLB Advanced Media LP*, 517 F.3d 1284, 1290 (Fed. Cir. 2008).

9       On April 3, 1992 Nee and his family received their visas.  Nee began work at Sony Japan

10 on April 15, 1992.  The next day, he signed an agreement with Sony Corp. in which he agreed to

11 assign all rights in patents that arose from his employment that he developed while he was

12 employed with Sony or for a year following his employment.  The following year, Sony Japan

13 formed SDT and moved Nee to SDT.

14       Nee worked at SDT until 1995.  He made annual "home visits" during this period.  On at

15 least one occasion, he helped DADC resolve small problems at its Terra Haute, Indiana facility.

16 However, DADC requested permission from SDT before seeking Nee's assistance.  Nee also

17 communicated with his DADC supervisor, Mr. Mitchell, to resolve problems at DADC's facility

18 while in Japan.

19       In April 1994, Nee assigned a patent that he invented to Sony Music Entertainment, Inc.,

20 DADC's parent corporation.

21       In 1994 or 1995, Nee was involved in discussions regarding the potential use of silver

22 alloy in the semi-reflective layer of compact discs.  He also participated in meetings where he

23 had access to confidential Sony information involving the use of such alloys.

24       In 1995, Nee was offered, and accepted a position as "Manager, Technical Support" at

25 DADC.  He then returned to Indiana.  Nee did not sign a confidentiality agreement.  On

26 February 19, 1998, human resources informed Nee that DADC was eliminating his position on

27 March 31, 1998.  He was then given severance pay and benefits through July 31, 1998.

28       At some time prior to leaving DADC, Nee formed Target, a solely owned company.

Then, on March 30, 1998, the day before ending his employment at DADC, Nee sent his attorney, Kurt Jones ("Jones"), a cover letter and Patent Disclosure. This letter referenced a conversation between Jones and Nee that occurred "about a month [before.]" In this Patent Disclosure, Nee described various silver alloys to be used in reflective and semi-reflective layers of digital storage media. In response to this letter and Disclosure, Jones conducted a patent search and located another patent that was substantially similar to some of Nee's proposed alloys. Nee then conducted additional research and eventually developed new alloys that he believed were patentable.

On April 2, 1998, Nee wrote SDT employees and informed them that he was no longer employed by Sony, that he had formed his own company, that he had developed an alternative to gold and silicon for use in the reflective and semi-reflective layer of DVDs, and that he wanted to work with them in their research into alloys. Nee then wrote to Dale Butrymowicz at Singulus Technologies on April 9, 1998. In this letter he stated that his experience at SDT led him to discover a "better solution," but that DADC would not let him pursue the idea.

On April 21, 1998, Nee sent a letter Koike, who was then president of SDT, which stated that he had developed an alloy that was an alternative to gold and silicon, and asked Koike if Sony would like the first chance to test this material. Nee began sending Sony samples of his silver alloy on August 31, 1998. These samples were sent with packaging slips labeled "Patent covering this composition is pending at the US Patent and Trademark Office." Sony later confirmed that these materials were based on a silver alloy.

In fact, Nee did file a patent application with the U.S. Patent and Trademark Office (the "PTO") on June 22, 1998 for "Metal Alloys for the Reflective or the Semi-Reflective of an Optical Storage Medium." The patent described the use of silver and copper alloys as an alternative to gold and silicon in the reflective and semi-reflective layers of compact discs or DVDs. Nee admitted in deposition that the four of the claims in the June 22, 1998 Patent Application arose from the March 30, 1998 Patent Disclosure.

On January 6, 2000, Nee informed Koike that the PTO issued the '889 Patent to Target, which involved "using silver alloys for DVD-9 application." Koike, through Mr. Okada, set up

a meeting with Nee in Tokyo.  Mr. Okada asked Nee to bring a copy of the patent so that Koike could read it, although Okada had viewed the patent online.

Throughout early 2000, Nee sold Sony targets using the silver alloy identified in the '889 Patent.  Indeed, in August 2000, Nee shipped targets to DADC at DADC's request.  However, at this time Sony did not have a business need for the '889 Patent.

Nee then filed at least 17 additional patent applications related to the use of alloys in the reflective and semi-reflective layer of optical storage media.  Many of these applications were filed as continuations or continuations-in-part of the '889 Patent.  All but two claim priority from the '889 patent, meaning that at least one claim in the subsequent patents depends on the '889 Application or an application that depended on the '889 Application.  Further, many of the claims in the subsequent-filed applications were rejected by the PTO for "obviousness type double patenting."  In each such case, Nee filed a terminal disclaimer, making the subsequent patent expire concurrently with the earlier patent, rather than disputing the rejection.  This Court previously found that, under the "common ownership" requirement of these disclaimers, that the same party must own all of the patents or else they will be unenforceable.   The two patents that do not claim priority from the '889 Patent are related to that patent through a series of terminal disclaimers and claims of priority.

Beginning in the Summer of 2000, Sony's IP counsel, Peter Toto ("Toto") began an investigation of Nee's activities.  This investigation culminated in a series of demand letters.  First, on September 26, 2000, Toto sent Nee a letter claiming that Sony owned the '889 Patent and demanding that Nee assign the patent to Sony.  Nee ignored this letter.  Toto sent Nee another letter in December 2000, again demanding that he assign the '889 Patent to Sony.  This time, Jones responded on Nee's behalf stating that Sony had no reason to claim the '889 Patent unless it had evidence that Nee created the patent before March 31, 1998.

In 2001, Sony retained outside employment counsel to investigate.  Toto believed that Nee was considered an employee until July 31 1998, when he stopped receiving severance payments.  However, as a matter of Indiana employment law, the severance payments did not extend Nee's employment.  Sony did not pursue the matter further until the inception of this

litigation.

In 2004, Target sued the Williams Defendants for infringement of Patent No. 6,790,503 (the "'503 Patent"). Sony and the Williams Defendants contend that the '503 Patent is related to the '889 Patent. The Williams Defendants raised Sony's ownership as a defense to the infringement suit. Williams and Sony also entered a "joint defense agreement," where DADC granted Williams a license under the '889 Patent in consideration for Williams' good-faith efforts to establish that Sony owns the '889 Patent. During discovery in this case, Nee testified twice that he did not conceive of the alloys in the '889 Patent while employed with Sony. He also allowed Sony to view a laboratory notebook, which had as its earliest date April 27, 2008.

Subsequently, Nee sued Sony for infringement in Indiana.

On April 26, 2007, DADC moved to intervene in this action, claiming, *inter alia*, that it owned the '889 Patent based on the January 1992 Agreement. Subsequently Nee counterclaimed against Sony Corp. and Sony Disc and Digital Solutions. The two were then designated as plaintiffs in intervention. Later, Sony uncovered the April 1992 Agreement and also asserted ownership of the '889 Patent under that agreement.

## LEGAL STANDARD

### I.    MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The Court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S. Ct. 2548 (1986). When the non-moving party bears the burden of proving the claim or defense, the moving party

can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e); *see also Anderson,* 477 U.S. at 248-49. Furthermore, a party cannot create a genuine issue of material fact simply by making assertions in its legal papers. There must be specific, admissible evidence identifying the basis for the dispute. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1980). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Anderson*, 477 U.S. at 252.

## II.   MOTION FOR RECONSIDERATION

Federal Rule of Civil Procedure 60(b) "provides for reconsideration only upon a showing of (1) mistake, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud; (4) a void judgment; (5) a satisfied or discharged judgment; or (6) 'extraordinary circumstances' which would justify relief." *School Dist. No. 1J, Multnomah County v. Acands, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) (quoting *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1442 (9th Cir. 1991)).

These grounds are further limited by the Local Rules. Local Rule 7-18 provides that a motion for reconsideration of a decision on any motion may be made only on the following grounds: "(a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision." L.R. 7-18. Finally, the Local Rule states that "[n]o motion for reconsideration shall in any manner repeat

any oral or written argument made in support of or in opposition to the original motion." *Id*.

**DISCUSSION**

**I.    THE TARGET MSJ**

Target and Nee moved for summary judgment on the grounds of the statute of limitations. The Motion raises three issues: a) whether a statute of limitations applies to ownership rights vested through an automatic assignment agreement; b) whether Indiana's or California's statutes of limitations apply; c) when the applicable statute began to run.  In order for Target and Nee to prevail each of these issues must be resolved in their favor.  Because the Court cannot conclude, as a matter of law, that the statute of limitations began to run more than four years before Sony filed suit, summary judgment is inappropriate.

**A.    The Statute of Limitations Applies**

Sony contends that no statute of limitations applies where, as here, an inventor enters an automatic assignment of patent rights.

In *DDB Technologies, LLC v. MLB Advanced Media, LP*, 517 F.3d 1284, 1286 (Fed. Cir. 2008), the Federal Circuit upheld a district court's ruling that the statute of limitations was not a viable defense to a lack of jurisdiction claim.  In that case, one of the named inventors of a series of patents entered an automatic-assignment agreement with his employer before creating the inventions.  *Id.* at 1287.  He and the other named inventor attempted to assign their rights to Plaintiff, DDB Technologies ("DDB").  Unbeknownst to DDB, the employer held rights in the patents due to the assignment agreement.  *Id.*  DDB then sued Defendant MLB Advanced Media, LP ("MLBAM") claiming that MLBAM was infringing the patent.  *Id.*  During the suit MLBAM contracted with the employer to purchase any rights held by the employer.  *Id.*  MLBAM then moved to dismiss claiming that the court lacked subject matter jurisdiction because not all of the owners of the patents – i.e. MLBAM – had been added as plaintiffs.  *Id.*  DDB argued, *inter alia*, that any rights the employer, and thus MLBAM, had in the patents were extinguished by the statute of limitations.  *Id.* at 1289.  However, the Circuit concluded that, the statute of limitations did not preclude the district court from finding a lack of jurisdiction because the agreement had automatically assigned the patent to the employer.  *Id.* at 1291.

8

There are two ways of interpreting this holding.  Target urges that the holding means only that the statute of limitations cannot be used to avoid a lack of standing or lack of jurisdiction defense asserted by an assignee where the assignor was subject to an automatic assignment agreement.  The other interpretation, urged by Sony, is that the statute of limitations can never be used by a party who was subject to an automatic transfer agreement.  For a number of reasons, the Court concludes that the former interpretation is correct.

First, the trial court in *DDB* explicitly ruled as matter of Texas law that an unconditional assignor gives up all rights as against that assignee.  *DDB Technologies v. MLB Advanced Media, LP*, 465 F. Supp. 2d 657, 669 ("Under Texas law . . . an assignor generally loses all control over the transferred rights or interest and 'can do nothing to defeat the rights of the assignee.'") (citations omitted).  Indeed, the Federal Circuit recognized that the only issue of federal law before it was whether the agreement was, in fact, an automatic assignment.  *DDB*, 517 F.3d at 1289-90.  Sony can point to no similar statement of California or Indiana law.  The cases cited in support of this proposition are not on point.  *See In re Marriage of Comer*, 14 Cal. 4th 504, 522 (1996) (once parent assigns right to support to county in return for services, parent cannot later revoke that right); *Felton v. Smith*, 48 Ind. 485 (1882) (statute of frauds no defense to valid oral contract to satisfy lien).

Second, the former interpretation comports with the well-established principle that the statute of limitations can be used only as a shield and not a sword.  *City of St. Paul, Alaska v. Evans*, 344 F.3d 1029, 1033 (9th Cir. 2003).  That is to say that the statute cannot be raised to defeat a time-barred claim that is asserted as a defense.  *Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.* 487 F. Supp. 2d 1099, 1112 (N.D. Cal. 2007) (citing *St. Paul*).  Thus, the assignor or licensor of a patent could not turn on the assignee or licensee after the statute of limitations had run and sue for infringement, arguing that the assignor's claim of ownership was barred by the statute of limitations.  *Id.* (claim of rights as licensee as a defense to an infringement suit is an affirmative defense not subject to the statute of limitations).

Third, the principle has not yet been expanded to affirmative claims for relief.  *Id.* (holding that the statute of limitations is a defense to an attempt to expand rights, which could be

construed as an affirmative claim for relief).  Although the court's characterization of the lack of standing claim in *Roche* may be at odds with the Federal Circuit's holding in *DDB*, nothing in *DDB* speaks to the underlying principle that the statute of limitations is a defense to affirmative claims but not a means to avoid an affirmative defense.

Fourth, both *Roche* and *Imatec, Ltd. v. Apple Computer, Inc.*, 81 F. Supp. 2d 471 have recognized that the statute of limitations cannot be used to bar a standing defense but can be used to bar affirmative claims.  *Roche*, *supra*; *Imatec*, 81 F. Supp. 2d at 483 n.5 ("a statute of limitations generally applies to claims and counterclaims, not to a defense of lack of standing.")

Finally, the non-application of the statute of limitations would lead to an anomalous result:  an assignee would have no time limitation on its ability to bring a suit to enforce its rights.  The statute of limitations serves important purposes of finality and judicial efficiency.  It would be odd indeed for such a claim to run in perpetuity even in the face of continued, blatant violation of the assignment agreement.  At some point, a plaintiff that sleeps on its rights loses them.

Accordingly, the statute of limitations does apply.

## B.    California's Statute of Limitations Applies

The next question to be addressed is whether California's or Indiana's statutes of limitations apply.

In addressing this choice-of-law question, the Court must first determine which state's choice-of-law rule governs.  *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 997 (9th Cir. 2006) (quoting *Cruz v. United States*, 387 F. Supp. 2d 1057 (N.D. Cal. 2005)).  Because this is a federal question case and the Court is exercising supplemental jurisdiction over Sony's state-law claims, 28 U.S.C. § 1367, the choice-of-law rules of the forum state govern.  *Paracor Finance, Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996).  Thus, California's choice of law rules apply.

In 1967, the California Supreme Court adopted the "governmental interest" for conflicts of law.  *Reich v. Purcell*, 67 Cal. 2d 551 (1967); *Hurtado v. Superior Court*, 11 Cal. 3d 574, 579-80 (1974).  This approach requires "analysis of the respective interests of the states involved

1  . . . ."  *Id.* at 579.   The "governmental interest" test requires a three-step analysis: 1) the court

2  determines whether the laws of the potentially affected jurisdiction are different; 2) if so, the

3  court analyzes the respective interests of the states involved to determine whether there is a true

4  conflict; finally 3) if a conflict exists, the court weighs the competing interests to determine

5  which would be more impaired of the other state's law were to apply.  *Kearney v. Salomon*

6  *Smith Barney, Inc.*, 39 Cal. 4th 95, 107-08 (2006).  The law of the state whose "interests would

7  be most impaired" applies.  *Bernhard v. Harrah's Club*, 16 Cal. 3d 313, 320 (1976).[1]

8        First the Court must determine whether the states' laws are different.  By and large the

9  statutes of limitations are different.  Breach of written contract claims have a 10 year limitations

10  period in Indiana and a four-year period in California.  *Compare* I.C. § 34-11-2-11 *and* Cal.

11  Code. Civ. P. § 337.1.  Breach of implied contract claims have a two-year limitations period in

12  both Indiana and California.  *See* I.C. § 34-11-2-1; Cal. Code. Civ. P. § 339.  Unjust enrichment

13  claims have six-year limitations period in Indiana and a three-year limitations period in

14  California.  *Compare* I.C. § 34-11-2-7 *and* Cal. Code Civ. P. § 338(d).  A misappropriate claim

15  has a three-year limitations period in both Indiana and California.  *See* I.C. § 24-2-3-7; Cal. Civ.

16  Code § 3426.6.  An unfair competition claim has a six-year limitations period in Indiana and a

17  four-year period in California.  *Compare Keaton & Keaton v. Keaton*, 842 N.E. 2d 816, 819

18  (Ind. 2006) *and* Cal. Bus. & Prof. Code § 17208.  A conversion claim has a two-year limitations

19  period in Indiana and a three-year period in California.  *Compare* I.C. §§ 34-11-2-4; 34-1-2-2

---

20

21  [1] It is unclear whether the "governmental interest" test or the prior "Restatement" test would govern the statute of limitations.  The *Reich* case only involved application of

22  state substantive law, and did not address the import of the "governmental interest" test on procedural decisions.  Further, cases following *Reich* have applied both tests.  In

23  *Ledesma v. Jack Steward Produce, Inc.*, 816 F.2d 482 (9th Cir. 1987), the issue of which test to apply divided a three-judge panel of the Ninth Circuit.

24  However, the result would be the same under the Restatement approach.  Under that approach "[a]n action will not be maintained if it is barred by the Statute of

25  Limitations of the forum . . . ."  Restatement (Second) of Conflicts of Law § 142 (i).

26  Traditionally, California applied this rule so that the California statute of limitations governed in all cases brought in California, except in certain circumstances inapplicable

27  here.  *Biewend v. Biewend*, 17 Cal.2d 108, 114 (1941); *Flowers v. Carville*, 310 F.3d

28  1118, [  ]; *In re Marriage of Ryan*, 22 Cal. App. 4th 841, 846 (1994).

*and* Cal. Code Civ. P. § 338(c).  A fraud claim has a six-year limitations period in Indiana and a three-year period in California.  *Compare* I.C. § 34-11-2-7 *and* Cal. Code Civ. P. § 338(d).  For every claim except for breach of implied contract and misappropriation, Indiana and California law differ.

Second, the Court must determine if both states have an interest in having their statutes of limitations apply.  "A state will have an interest in having its law applied if the policies underlying the law would be thereby advanced."  *Ashland Chemical Co. v. Provence*, 129 Cal. App. 3d 790, 794 (1982).  The two interests implicated by statutes of limitations are the protection of the enacting state's residents and courts from the difficulty of contending with "stale cases in which memories have faded and evidence has been lost."  *Id.* (citing *McGee v. Weinberg*, 97 Cal. App. 3d 798, 804 (1979)).   Accordingly, the two important questions in determining which statute of limitations applies are: 1) the residence of the defendant or defendants; and 2) the forum.  *Ashland*, *supra*; *see also Nogart v. Upjohn Corp.*, 21 Cal. 4th 383, 395 (1999) ("[The statute] has as a purpose to protect defendants from the stale claims of dilatory plaintiffs.")  "[W]hen both the forum and the defendant's residence [are] the same, no state other than California ha[s] an interest in having its statute applies."  *Ledesma*, *supra*.[2]

In *Ashland*, the California appellate court ruled that California was the only interested state under indistinguishable facts from this case.  There, the plaintiff, a Kentucky corporation, entered a promissory note with California defendants in Kentucky to be repaid in Kentucky.  *Ashland*, 129 Cal. App. 3d at 793.  The note stated that it was "governed by and construed in accordance with the laws of the Commonwealth of Kentucky."  *Id.*  Kentucky applied a 15-year statue of limitations to actions on promissory notes; California applied a four-year statute.  *Id.*  The defendants demurred, and the trial court dismissed the suit under California's statute of limitations.  *Id.*

In upholding the trial court's decision, the appellate court identified California's interests as protecting its residents and courts from stale suits.  *Id.* at 794.  The court stated that California

---

This rule essentially re-establishes the Restatement approach in any case where the defendant resides in the forum state.

had an interest in the suit because California was the forum and the defendants were California residents. *Id.* In contrast, the court concluded that Kentucky had no interest because none of the defendants resided in Kentucky and the suit was not pending in Kentucky. *Id.*[3] The court characterized the situation as "the very paradigm of a false conflict." *Id.* (quoting Cavers, *Comments on Reich v. Purcell*, 15 U.C.L.A. L. Rev. 647).

The Ninth Circuit has encapsulated the California courts' position on conflicts of statutes of limitations as follows:

> Where the conflict concerns a statute of limitations, the governmental interest approach generally leads California courts to apply California law, and especially so where California's statute would bar a claim. California's interest in applying its own law is strongest when its statute of limitations is shorter than that of the foreign state, because a state has a substantial interest in preventing the prosecution in its courts of claims which it deems to be stale. Hence, subject to rare exceptions, the forum will dismiss a claim that is barred by its statute of limitations.

*Deutsch v. Turner Corp.*, 324 F. 3d 692, 716-17 (9th Cir. 2003). Thus, following *Ashland*, the Ninth Circuit and the district courts have applied California's statute of limitations in cases involving California defendants in California courts. *See e.g. Handel v. Artukovic*, 601 F. Supp. 1421, 1435-36 (C.D. Cal. 1985); *Nelson v. International Paint Co.*, 716 F. 2d 640, 644 (9th Cir. 1983).

The parties have identified no case, and the Court could locate none, that applied a statute of limitations other than California's where the defendants were residents of California and California was the forum.

_____

[3] Sony contends that "[this] holding was itself deemed questionable in *Habrecht & Quest Venture Partners v. Am. Med. Int'l, Inc.*, 38 Cal. App. 4th 1532, 1549 n.17 (1995)." This is incorrect in any material sense. *Hambrecht* challenged two holdings of the *Ashland* decision, both relating to application of a forum selection clause.

The fact that the claim arose in Indiana is irrelevant because the defendant resides in California and California is the forum. Although the state where the purported wrongdoing occurred might give rise to a true conflict where the defendants do not reside in California, *see Ledesma*, *supra*.; *see also Huyunh*, *supra*; *Shafler v. HSBC Bank, USA*, 06-5908, 2007 WL 578993 (N.D. Cal. Feb. 21, 2007) (applying New York statute in diversity case between California plaintiff and New York defendants because New York was situs of claim), it is immaterial where they do, *see Nelson*, *supra*. Indeed, the Ninth Circuit in *Ledesma* only proceeded to consider where the claim arose because the defendant was not a California resident.

Sony seeks to avoid this result based on Ninth Circuit precedent recognizing that "the courts have consistently declined to recognize after-acquired residence as a source of governmental interest on the grounds that consideration of this factor would encourage forum shopping." *Huynh*, 465 F.3d at 1001 (quoting *McGhee v. Arabian Oil Co.*, 871 F.2d 1412, 1422 (9th Cir. 1989)). This argument is untenable.

The after-acquired residence referred to in *Huynh* and *McGhee*, and the cases cited therein, is that of plaintiffs. *Huynh*, 465 F.3d at 1001-02 (purported class representatives and class members live in California); *McGhee*, 871 F.2d at 1423 (one plaintiff moved to California after claim arose in Saudi Arabia); *Roesgen v. American Home Prods. Corp.*, 719 F.2d 319, 321 (9th Cir. 1983) (plaintiffs moved to California after entering contract at issue) ; *Zimmerman v. Allstate Ins. Co.*, 179 Cal. App. 3d 840, 847 (1986) (plaintiff moved to California after car accident); *Cossman v. DaimlerChrysler Corp.*, 108 Cal. App. 4th 370 (2003) (discussing plaintiffs residence for purposes of Cal. Code Civ. P. § 361); *Giest v. Sequoia Ventures, Inc.*, 83 Cal. App.4th 300 (2000) (discussing plaintiffs residence under Section 361). However, as the Ninth Circuit noted in *Ledesma*, a plaintiff's residence is not a relevant government interest in cases involving the statute of limitations.

Further, aside from *Huynh*, none of these cases presented the issue before the Court in this case – i.e. which state's statute of limitations applies under the "governmental interests" approach. *McGhee* and the cases cited therein involve which state's substantive law to apply.

*McGhee*, 871 F.2d at 1423 (substantive law of defamation); *Roesgen*, 719 F.2d at 321 (whether to enforce forfeiture provision of contract); *Zimmerman*, 179 Cal. App. 3d at 847 (insurance regulation). The cases cited in *Huynh* involved application of the California "borrowing statute," Cal. Code Civ. P. § 361, which is not at issue in this case. *Cossman*, 108 Cal. App. 4th 370; *Giest*, 83 Cal. App. 4th 300.

The cases involving substantive law questions rather than California's "borrowing statute" identified two interests underlying the "after-acquired residence" rule: 1) prevention of forum shopping; and 2) the unfairness of requiring defendants in other states to be aware of and comply with California law. Neither of these policies is implicated in the present case.

First, Nee and Target cannot reasonably be characterized as "forum shopping" in moving to California. This is not the case where a plaintiff moved to a state with favorable laws to sue over conduct taking place in a state with less favorable laws. Instead, Nee and Target have resided in California longer than any of the statutes of limitations at issue. Further, it was Sony, not Nee that chose to pursue its claims in California. Although Target instituted this suit by suing the Williams defendants, Sony chose to intervene in this case. Sony could have simply counterclaimed in Target's Indiana suit against Sony. However, perhaps based on favorable rulings in this Court, Sony chose to intervene here. Tellingly, Target attempted to transfer venue to New York, and this Court characterized the attempt as "forum shopping." In other words, if Target had its choice, it would pursue its claims elsewhere.

Second, and for much the same reason, there is no risk of Sony being compelled to learn and follow the law of every state. In contrast to a case where a plaintiff settles in a state with laws different from those where the claim arose and seeks the benefit of those laws, here Sony chose to pursue its claim in California. For instance, in *McGhee*, *supra*, the plaintiffs suffered an alleged harm in Saudi Arabia, which did not recognize a cause of action for defamation. One then moved to California, which does recognize such a cause of action. It is certainly not fair to subject a defendant to the laws of every jurisdiction where a plaintiff might move. Defendants are clearly entitled to expect that they will be subject to the laws of the state where they reside and where the cause of action accrued. However, it is far from clear that plaintiffs are entitled to

1   expect to sue a defendant who resides in one state in the courts of that state and have the court

2   apply the procedural rules of the state where the claim arose.

3        Indeed, the Court is compelled to apply the rule identified in *Ashland* and *Nelson*.  Under

4   this rule, the relevant factors are the forum and the defendant's residence.  They contain no

5   "residence at the time the claim arose" requirement.   Because Sony intervened in California, and

6   because the defendants reside in California,[4] there is no "true conflict" as the only interested

7   state is California.

8        At oral argument Sony argued that it is properly classified as a defendant, rather than a

9   plaintiff.  In essence, Sony contends that it was compelled to enter this suit because the Williams

10  Defendants were attacking the validity of the patents that Sony purportedly owns and because

11  Nee sought declaratory relief on the issue of ownership.  Further, it was Nee that chose

12  California as the forum for his suit against the Williams Defendants.  Sony also points out that

13  it's interests are aligned with the Williams Defendants rather than Target and Nee.

14       The Court is unpersuaded by this argument.  A plaintiff is "a party who brings a civil suit

15  in a court of law."  Black's Law Dictionary (8th ed. 2004), *plaintiff*.  Federal Rule of Civil

16  Procedure 17(a) requires that a suit be brought by the "real party in interest," the party seeking to

17  enforce a substantive right.  This rule applies to both initial plaintiffs and intervenors under Rule

18  24.  *See United States v. 936.71 Acres of Land, More or Less, in Brevard County, State of Fla.*,

19  418 F.2d 551, 556 (5th Cir. 1969).  Here, the party seeking to assert a substantive right – i.e.

20  ownership of the patent vis-a-vis Nee – is Sony.  Indeed, DADC intervened as a matter of right

21  under Federal Rule of Civil Procedure 24(a)(2) claiming "an interest relating to the property or

22  transaction which is the subject of [this] action. . .."  Thus, Sony is the "real party in interest"

23  and the plaintiff as against Nee and Target.

24       As a practical matter, Sony has acted as a plaintiff and Nee and Target as defendants with

25  respect to the intervention.  DADC filed a Complaint in intervention and designated itself a

26

27       [4] Sony recently added a British Virgin Islands corporation as a defendant, but

28  alleges that this defendant is Nee's "alter ego."

Plaintiff in Intervention.   Sony Corp. and SDT were later similarly designated and raised additional claims against Nee.  The Sony parties now seek $30 million or more in damages against Nee and Target.  They also assert ownership and seek to establish these rights against Nee and Target.

Moreover, Sony's argument that it was forced into this forum is overblown.  First, Sony admittedly has an agreement with the Williams Defendants regarding this litigation.  Accordingly, the theory that Sony could not stop the Williams Defendants from challenging the validity of the patents at issue without intervening is untenable.  Further, Sony would likely not have been barred by *res judicata* in pursuing its rights even if Nee had established ownership of the patents in a suit against the Williams Defendants.

The fact that Nee and Target have raised a statute of limitations defense is telling.  They are using this as an affirmative defense to an claim of liability brought by the Sony parties.  This defense only arises because Target and Nee are defendants vis-a-vis Sony.  As discussed in the previous section, the statute of limitations would not be available to aid Target and Nee in establishing affirmative rights in the patents because it cannot be used as a "sword."  Accordingly, Nee and Target must be defendants in this matter in order for them to assert the statute of limitations.

Because Target and Nee are defendants and California citizens, and because this case was pursued in California courts, California's statute of limitations applies.

### C.   A Triable Issue of Fact Exists as to Whether Nee's Purported Fraudulent Concealment Tolled the Statute of Limitations

California court's have recognized a statute of limitations that "operates conclusively across the board and not flexibly on a case-by-case basis."  *Nogart*, *supra*.  A cause of action will be barred under the statute if not brought within the specified period after accrual.  Cal. Code Civ. P. § 312).

A cause of action accrues when all of the elements are completed and liability arises.  *Nogart*, 21 Cal. 4th at 397.  It is undisputed that Nee's alleged wrongful act was his failure to turn over his invention to Sony.  This act occurred, at the latest, when Nee sent the March 30,

1998 letter and Patent Disclosure to his attorney.  Accordingly, Sony's cause of action accrued on or before March 30, 1998.

The "most important" exception to the traditional accrual rule is the "discovery rule." *Id.* (citations omitted) This rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Id.* (citations omitted).  The California Supreme Court summarized the scope of the rule as follows:

> [T]he plaintiff discovers the cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge thereof - when, simply put, he at least suspects . . . that someone has done something wrong to him[,] "wrong" being used, not in any technical sense, but rather in accordance with its lay understanding.  He has reason to discover the cause of action when he has reason at least to suspect a factual basis for its elements.  He has reason to suspect when he has notice or information of circumstances to put a reasonable person on inquiry.

*Id.* at 397-398 (internal citations, quotation marks and footnotes omitted).  Notice of a cause of action can be actual or constructive.  *General Bedding Corp. v. Echevarria*, 947 F.2d 1395, 1397 (9th Cir. 1991).  "A plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery.  Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights."  *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1111 (1988).

This rule creates a duty in prospective plaintiffs to engage in reasonable investigation of their claims.  *See Nogart*, 21 Cal. 4th at 398 ("within the applicable limitations period, he must indeed seek to learn the facts necessary to bring the cause of action in the first place - he cannot wait for them to find him and sit on his rights; he must go find them himself if he can and file suit if he does.") (internal citations omitted).  If a reasonably prudent person would suspect that he or she has been injured, plaintiffs have a duty to investigate further and are charged with knowledge of facts that would be uncovered in such investigation.  *Miller v. Bechtel Corp.*, 33

18

Cal. 3d 868, 875 (1983) (citing *Bedolla v. Logan & Frazer*, 52 Cal. App. 3d 118, 131 (1975)).

The related doctrine of "fraudulent concealment" tolls the statute of limitations where the defendant fraudulently conceals the cause of action from the plaintiff so that the plaintiff, acting as a reasonable person, does not know that it has a cause of action  *E.W. French & Sons, Inc. v. General Portland, Inc.*, 885 F.2d 1392, 1399 (9th Cir. 1989) (quoting *Hennegan v. Pacifico Creative Service, Inc.*, 787 F.2d 1299, 1302 (9th Cir. 1986)).   To successfully raise fraudulent concealment, Sony must prove: a) that Nee or Target fraudulently concealed the fact that he created the patent while at Sony or within the one-year trailing clause; b) that Sony did not discover the facts underlying its claim; and c) that Sony exercised due diligence in investigating the matter. *Id.* (citing *Volk v. D.A. Davidson & Co.*, 816 F. 2d 1406, 1415-16 (9th Cir. 1987)); *see also Baker v. Beech Aircraft Corp.*, 39 Cal. App. 3d 315, 321 (1974) (plaintiff must show: a) when fraud was discovered; b) circumstances of discovery; and c) that it was not at fault in failing to discover and "had no actual or presumptive knowledge of facts sufficient to put him on inquiry.")   Sony must also show that it relied on Nee's fraudulent conduct in failing to timely file its claim.  *Guerrero v. Gates*, 442 F.3d 697, 706-07 (9th Cir. 2006).  In other words, Sony must show (a) that it lacked inquiry notice of the facts underlying its claims, and (b) that it gained such notice within the statute of limitations period.  *Clemens v. DaimlerChrysler, Corp.*, 534 F.3d 1017, 1024 (9th Cir. 2008) (citing  *Bedolla*, *supra*).

 "A defendant's fraud in concealing a cause of action against him tolls the applicable statute of limitations, but only for that period during which the claim is undiscovered by plaintiff or until such time as plaintiff, by the exercise of reasonable diligence, should have discovered it." *Sanchez v. South Hoover Hosp.*, 18 Cal. 3d 93, 99 (1976).

Unlike the discovery rule, however, the fraudulent concealment doctrine tolls the statute until the plaintiff is on actual or inquiry notice of the facts underlying his or her specific cause of action. *Migliori v. Boeing North Am., Inc.*,114 F. Supp. 2d 976, 984 (C.D. Cal. 2000).  Thus, where a plaintiff suspects wrongdoing but fails to discover the responsible party due to fraud, although the discovery rule will not toll the statute of limitations the fraudulent concealment doctrine will. *See Kimball v. Pacific Gas & Elec. Co.*, 220 Cal. 203 (1934).  It is still the case

under the fraudulent concealment doctrine that "the statute is tolled only for as long as the plaintiff remains justifiably ignorant of the facts upon which the cause of action depends; discovery or inquiry notice of the facts terminates the tolling." *California Sansome Co. v U.S. Gypsum*, 55 F.3d 1402, 1409 n.12 (9th Cir. 1995).   Notice means notice of facts giving rise to the claim, not simply hunches or suspicions that give rise to a duty to investigate, but do not compel a suit. *Migliori*, 114 F. Supp. 2d at 985.

Under the fraudulent concealment doctrine, the plaintiff still has a duty to engage in reasonable efforts to discover the facts at issue. *Id.*  However, a plaintiff that takes such reasonable efforts, but fails to discover the truth, can assert the fraudulent concealment doctrine. *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1475 (9th Cir. 1994) (citing *Sears, Roebuck & Co. v. Blade*, 139 Cal. App. 2d 580 (1956)).

Nee and Target presented a number of facts that might have reasonably placed Sony on notice on or before April 26, 2003, that it had a cause of action against Nee for breaching his January 1991 Contract with DADC.  Indeed, their evidence suggests that Sony should have known that it had a cause of action when Toto sent Nee the September 2000 letter demanding that Nee turn over the patents to Sony.

First, the timing of Nee's patent application, very shortly after leaving DADC, which Sony was aware of, may well have put a reasonable person on notice of Sony's claims against Nee and Target.  As Target and Nee's counsel pointed out at oral argument, employers frequently file suit where an employee files a patent application suspiciously soon after his or her employment, leaving the task of uncovering "smoking gun" evidence to pretrial discovery.

Second, the Court sees no valid excuse for why Sony did not recognize until long into this litigation that Nee had a second contract with Sony Corp., which contained a one-year trailing clause.  Nee filed his patent application well within this one-year period.  His potential violation of one Sony agreement is certainly strong circumstantial evidence that he violated another.

Third, Nee communicated with Sony employees frequently after leaving DADC.  A mere two days after leaving Sony, Nee contacted a group of Sony employees, stated that he developed an alternative to gold and silicon for use in DVDs, and asked to work with these individuals in

their work on DVDs.  On April 21, 1998, still less than a month after leaving Sony, Nee sent a letter to SDT's president, Koike, stating that he had developed an alternative to gold and silicon and asking if Sony wanted to test the new material.  Koike forwarded this proposal to other Sony staff.  This is clearly suspicious and would have put a reasonable person on notice of the need to investigate.

Fourth, Nee also sent Sony samples of his alloys beginning a mere five months after he left DADC.  On August 31, 1998, Nee sent Sony samples of his silver alloy, with packaging slips stating "Patent covering this composition is pending at the US Patent and Trademark Office."

Fifth, Sony had access to the '889 Patent and even purchased targets from Nee that embodied this patent.  On January 6, 2000, Nee emailed Koike and stated that the '889 Patent, "about using silver alloys for DVD-9 application" issued to Target.  Koike then set up a meeting with Nee in Tokyo and asked Nee to bring a copy of the patent for Sony employees to read.  Mr. Okada, a Sony employee, stated that he had already looked at the patent on the internet.

However, the evidence of Nee's fraudulent concealment and Sony's efforts to uncover evidence to support its claim are sufficient to raise a genuine issue of material fact.

On the issue of Nee's fraud in concealing the fact that he created the inventions while at Sony, Sony points out that Nee continually denied that he developed the invention while at Sony.  Nee contends that he based these denials on the legal definition of "conceived" in the patent context.  However, his deposition testimony could be interpreted both to mean that he did not legally conceive of the invention while at Sony, or that he did not think up the invention while at Sony.  If his statements are understood in the lay sense – i.e. that he did not come up with the idea for silver and copper alloy while at Sony – then they are directly contradicted by the March 30, 1998 letter and Patent Disclosure.  They are also contradicted by a statement Nee made to Dale Butrymowicz at Singulus Technologies on April 9, 1998.  There, he stated that his experience at SDT led him to discover a "better solution," but that DADC would not let him pursue the idea.

Notably, Nee's DADC contract does not relate to inventions ultimately "conceived of"

while at Sony.  Instead, it relates to inventions in which Nee "participated" while employed by DADC.  Accordingly, the ultimate date of "conception" seems irrelevant.  Thus, Nee's deposition testimony could well be read in its lay sense, and would appear to border on perjury.

Another potential act of fraudulent concealment occurred when Nee's counsel's sent Sony a letter in response to the December 2000 demand letter.  In that response Jones noted that Nee's employment ended on March 31, 1998 when he left work, rather than July 31, 1998 when his severance benefits ended.  Jones further stated that "Mr. Nee did not invent the subject matter of the '889 patent as an employee of DADC."  Jones closed by stating "unless [DADC] has reason to believe that Mr. Nee made his inventions before March 31, 1998 to possibly invoke the employment agreement, DADC has no reason to make any claim to any of Mr. Nee's patents for which he makes application after March 31, 1998."  Jones made these statements after receiving the March 30, 1998 letter and Patent Disclosure.  He later testified that the March 30, 1998 disclosure related to silver alloys, which ultimately became the '889 Patent. He also knew that at the time of the letter, Sony's theory was that Nee created the inventions while covered by the severance payments.

Finally, Nee and Jones allowed Sony to review Nee's invention book.  The first entry in this book was dated April 27, 1998.  The notion that Nee did not begin his inventions until April 27, 1998 is contradicted by his statements to Sony employees on April 2, 1998 and his statement to Dale Butrymowicz on April 9, 1998.

These three facts are sufficient, when taken together, to raise a triable issue of fact as to whether Nee and Jones fraudulently concealed Sony's cause of action.

On the issue of reasonable reliance, Nee and Target contend that Sony has not presented evidence that it reasonably relied on the alleged fraud in failing to bring it suit.

First, they argue that it was unreasonable for a sophisticated entity like Sony, with considerable litigation experience, to rely on a party's denials of wrongdoing in failing to pursue a claim.  In *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (1978), the Ninth Circuit recognized the circumstances where a denial of wrongdoing could constitute fraudulent concealment, stating that "[t]he affirmative act of denying wrongdoing may constitute fraudulent

concealment where the circumstances make the plaintiff's reliance upon the denial reasonable . . ..” After considering the parties oral argument, the Court is convinced that Nee and Jones' alleged fraud went far beyond mere denials of wrongdoing.

In his December 2000 Letter, Jones affirmatively represented that Nee did not create his inventions prior to March 31, 1998. He did so knowing that Nee had sent him a Patent Disclosure prior to that date. Whether one generally sends such a disclosure to conduct a patent search before creating an invention is a question of fact that cannot be resolved at this juncture. Further, Nee made what could be construed as repeated misrepresentations during depositions. Finally, the invention notebook, if false, constitutes affirmative fraudulent conduct far beyond mere litigation posturing.

Further, the evidence raises at least a triable issue of fact as to whether Sony engaged in a reasonable investigation and reasonably relied on Nee and Target's fraudulent concealment in failing to bring a claim.

Prior to sending the September 2000 and December 2000 demands to Nee, Toto engaged in an investigation of Nee. Although the communications between Toto and other Sony employees are privileged, it is clear that Toto contacted a number of employees to discuss Nee during the period leading up to the letters. Further, Toto took the step of actually sending Nee the two letters demanding that Nee turn over the patent.

At this point, DADC's theory was that Nee had created his invention during the period when he received severance payments from Sony. In Jones' December 2000 letter to Sony, he pointed out that under Indiana law an individual is not considered an employee during his severance period. Sony retained employment counsel to determine whether this was the case. When counsel confirmed Indiana law on this point, Sony ceased its investigation.

This is circumstantial evidence that Sony conducted a reasonable investigation and relied on Nee and Jones' statements in discontinuing that investigation. As Sony's counsel puts it, Sony hit a dead end in its investigation when Nee denied creating the invention before March 31, 2008. If believed by a jury, this would suggest that Sony was reasonable in conducting an investigation.

The most difficult question presented is whether ceasing the investigation at this point was reasonable.  However, this is a factual question and must be resolved by a jury.  After Nee's denial, and Sony's discovery that Nee was not considered an employee during the severance period, Sony had only circumstantial evidence for its claim.  It was in a position of having to prove that Nee participated in developing his invention while at Sony based essentially on the suspicious timing of his Patent Application and the fact that he emailed Sony employees soon after leaving and told them that he had developed an alternative to gold and silicon.  These facts are certainly suspicious, and a reasonable attorney could well file suit on this basis and flesh out his or her claims during discovery.  However, the Court declines to rule, as a matter of law, that it was unreasonable for Sony to fail to file suit on this basis.

Accordingly, the evidence presented creates a genuine issue of material fact as to whether Sony reasonably relied on Nee and Jones' fraud in failing to pursue its claim.

**C.**     **Conclusion**

Any claims that accrued outside of California's statute of limitations period are barred by the statute unless tolled.  However, a genuine issue of material fact exists as to whether the statutes should be tolled as a result of Nee and Jones' fraudulent concealment.  Accordingly, this question must go to the jury.

Therefore, Target and Nee's Motion for Summary Judgment is hereby DENIED.

**II.     THE SONY MSJ**

Sony seeks summary judgment of its ownership of all of Target and Nee's patents that purportedly relate to the '889 Patent.  In order to justify summary judgment, the Court must find as a matter of law: a) that Nee was subject to the DADC Assignment Agreement; b) that the material disclosed in the March 30, 1998 Patent Disclosure eventually became the '889 Patent; and c) that each of the other patents that Nee assigned to Target are based on the '889 Patent and, thus, the March 30, 1998 Patent Disclosure.

In its February 6, 2007 Order, the Court denied the Williams Defendants' Motion for Summary Judgment based on Sony's ownership of the '889 Patent and related Patents.  In doing so, the Court found genuine issues of material fact on each of the abovementioned points.

DADC now presents additional evidence to demonstrate that absence of a genuine issue of fact. However,

even in light of this new evidence, genuine issues remain on each point.  Accordingly, summary judgment is inappropriate.  The Court will address each issue in turn.

### A.    A Triable Issue of Fact Exists as to Whether Nee Had a Continuing Employment Relationship with DADC

As the Court noted in its February 6, 2007 Order, if Nee had a continuing employment relationship with DADC through the period he was at SDT then the invention described in the March 30, 1998 Patent Disclosure would belong to DADC.

DADC attempts to characterize Nee's employment with SDT as an "assignment" from Nee's home base at DADC.  DADC points out that DADC paid a portion of Nee's salary, provided Nee benefits and paid for his annual flights back to the United States.  DADC further notes that Nee did some work for DADC on such visits and that he corresponded with DADC personnel to resolve other problems.  Nee also admitted that his work at SDT benefitted all three major Sony manufacturing facilities, including DADC.  Finally, Nee assigned a patent he developed while at SDT to DADC's Parent corporation.

In constrast, Nee characterizes SDT as his employer and suggests that he had little connection with DADC while employed with SDT.  In opposition, Nee submitted more than a scintilla of evidence to show that he did not have a continuing employment relationship with DADC while employed at SDT.

First, the course of Nee's initial employment negotiations suggests that he did not have such a relationship with DADC.  When Nee began employment discussions, Koike asked Nee to work for Sony Japan, and not DADC.  During employment negotiations, Nee requested the CBS Relocation Policy, which did not provide for split payments between a US office and a foreign office.  Without a split payment, Nee would have been unable to contribute to a 401k plan.  Accordingly, another expatriation policy was suggested whereby Nee remained an official employee of DADC and DADC provided split payments while seeking reimbursement for those payments.  Nee presented evidence that he never asked to work for DADC.  Finally, Nee has

presented evidence that DADC did not commit to holding a position for him after he finished work with SDT.

Second, while Nee was employed with SDT, DADC played little role in his day-to-day affairs.  If one were employed by a home base, and only "on assignment" to a foreign office, one would expect at least some oversight by the home office.  See *Fioretti v. Aztar Ind. Gaming Co., LLC*, 790 N.E.2d 587, 589 (Ind. Ct. App. 2003) (identifying seven factors to determine whether an employee works for two employers, primary among them management responsibility).  Evidence submitted by Nee demonstrates that DADC did not manage Nee, oversee his performance, or provide evaluations to him while he worked at SDT.  Indeed, Nee has presented evidence that DADC lacked knowledge of Nee activities at SDT.  The only work Nee did for DADC during his term at SDT was a temporary assignment on one of his trips to the United States.  Even then DADC asked permission from SDT before giving Nee this assignment.

Finally, when Nee returned to DADC, he was given what was clearly a new position as Manager, Technical Support.  He then engaged in further employment discussions with DADC.  During such discussions, DADC stated that Nee's family would not have health coverage until he began employment with DADC.  Nee ultimately accepted the position and returned to DADC.

Each of these facts, submitted by Nee, suggest that his characterization of his employment is accurate.  Accordingly, a genuine issue of material fact exists as to whether he had a continuing employment relationship with DADC that would entitle DADC to the patents.

**B.** **A Triable Issue of Fact Exists as to Whether the March 30, 1998 Patent Disclosure Included the Invention Subject of the '889 Patent[5]**

---

[5]Nee and Target again contend that, because Nee did not technically "conceive" of the invention described in the March 30, 1998 Patent Disclosure during his employment with DADC, DADC cannot assert ownership in the invention.  However, the Court previously concluded that Nee participated in the March 30, 1998 Patent disclosure while employed by DADC.  *See* Feb. 6, 2007 Order, 14-17.  Accordingly, that issue has been resolved and is not subject to reconsideration.  Instead, the remaining issue is whether the March 30, 1998 Patent Disclosure is similar enough to the '889 Patent such that Sony can assert rights in the '889 Patent.

In its February 6, 2007 Order, this Court recognized that a triable issue of fact existed as to "whether the invention discussed in the March 30, 1998 Patent Disclosure is similar enough to the invention ultimately patented in the '889 Patent, such that the '889 Patent vested in DADC under the [DADC] agreement."  Feb. 6, 2007 Order, 17.  In its Motion, Sony has failed to add substantially to the evidence submitted before the Court's February 6, 2007 ruling.  Accordingly, a triable issue of fact remains on the question of whether the inventions are sufficiently similar.

Sony points out that the titles, abstracts, background descriptions, summaries of objects, and examples, are similar in the March 30, 1998 Patent Disclosure and the Patent Application that matured into the '889 Patent (the "'889 Application").  Sony further demonstrates that certain of the claims in the '889 Patent are similar or identical to claims in the March 30, 1998 Patent Disclosure.

However, Nee and Target respond by pointing to expert testimony suggesting that there are 108 silver alloys in the '889 Patent that are not included in the March 30, 1998 Patent Disclosure.  Further, Nee and Target's expert concluded that 17 of the 30 claims in the '889 Patent are different from the March 30, 1998 Patent Disclosure.  Indeed, Nee stated that after Jones' patent search, conducted in response to the March 30, 1998 Patent Disclosure, turned up prior art, Nee had to go back to the drawing board with respect to his alloys.

This evidence is certainly sufficient to raise a triable issue of fact as to whether the '889 Patent contains the same or a substantially similar invention to the March 30, 1998 Patent Disclosure.

**C.**    **A Triable Issue of Fact Exists as to the Relationship Between the '889 Patent and the other Patents in Target's Portfolio**

Finally, in order to support its claim to all of the patents that Nee developed following the '889 Patent, DADC must demonstrate, as a matter of law, that Target's other patents are sufficiently similar to the '889 Patent such that all of the other patents are Sony's property.  Because a genuine issue of material fact exists on this question, as it did at the time of the Court's February 6, 2007 Order, summary judgment is inappropriate.

DADC is correct that an individual cannot make minor improvements to an invention

1  properly owned by another and attempt to patent the improved invention as his own. *See*

2  *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1249 (Fed. Cir. 1989) (where patent

3  contains several claims improperly relying on confidential information and one claim improving

4  upon those claims, patent is property of owner of the wrongfully acquired confidential

5  information); *De Long Corp. v. Lucas*, 176 F. Supp. 104, 133-34 (S.D.N.Y. 1959) (where

6  employee makes "slight" improvements over invention owned by employer, patent of invention

7  with said improvements belongs to employer).   Accordingly, Sony attempts to demonstrate that

8  each of Nee's subsequent patents are mere "slight improvements" over the '889 Patent and the

9  March 30, 1998 Disclosure.

10         First, DADC points out that many of the subsequent patents were filed as continuations or

11  continuations in part of the '889 Application or other applications claiming priority based on the

12  '889 Patent.  Filing a patent as a continuation permits the applicant to take advantage of the

13  earlier application date of the original patent. 35 U.S.C. § 120.  Thus, the applications filed as

14  continuations of the '889 Patent were treated as though they were filed on the same date as the

15  '889 Application.  In order to file an application as a continuation of a prior application the

16  original application must contain certain "enabling" disclosures, which: include "a written

17  description of the invention, and of the manner and process of making and using it, . . . and . . .

18  set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. §

19  112.  Accordingly, in order to for later applications claim priority based on the '889 Application,

20  the '889 Application was required to contain a description of the subsequently-filed applications.

21  Thus, DADC is correct that at least one claim of each of these patents must depend on the '889

22  Patent or patents that depend on the '889 Patent.

23         However, the fact that the other patents are related to or depend on the '889 Patent is

24  insufficient to demonstrate, as a matter of law, that subsequent patents were only slight

25  improvements on the '889 Patent.  Indeed, a substantial improvement over existing technology

26  might "depend" on that technology.  However, no party has suggested that no matter the degree

27  of Nee's improvements, all future inventions that depend on or relate to the '889 Patent are

28  Sony's property.  The fact that the patents are of the same family simply fails to answer the

1   relevant question of whether they are all the same invention, reflected in the March 30, 1998

2   Patent Disclosure and embodied in the '889 Patent.

3       DADC also points out that most of the subsequent patents were terminally disclaimed

4   with the '889 Patent.  A terminal disclaimer allows a party to avoid a rejection by the PTO

5   examiner for "obviousness-type double patenting" by allowing the subsequently patent to expire

6   on the same date as the original patent.  Obviousness-type double patenting occurs where two

7   applications are "drawn to inventions so very much alike as to render one obvious in view of the

8   other."  *Gerber Garment Tech., Inc. v. Lectra Sys., Inc.*, 916 F.2d 683, 686 (Fed. Cir. 1990).  A

9   rejection for obviousness-type double patenting prevents an inventor from extending the life of a

10  patent by filing substantially identical patent.  *Id.*  When a PTO examiner rejects an application

11  for obviousness-type double-patenting, the applicant can either dispute the finding or avoid the

12  rejection by filing a terminal disclaimer.  By filing a terminal disclaimer, the applicant limits the

13  life of the subsequently patents to that of the original patent.  *Ortho Pharm. Corp. v. Smith*, 959

14  F.2d 936, 941 (Fed. Cir. 1992).  Pursuant to 37 C.F.R. § 1.321(c)(3) a patent with a terminal

15  disclaimer is unenforceable if it is not commonly owned with the original patent.

16      The PTO examiner rejected claims in many of Nee's patents for obviousness-type double

17  patenting.  Rather than dispute this finding, in each case Nee terminally disclaimed the patents

18  so that they would elapse on the same date as the '889 Patent.  DADC suggests that this

19  evidence shows, as a matter of law, that the subsequent patents are "part of the technology

20  disclosed in the March 1998 Patent Disclosure and Nee's original '889 Patent."

21      However, the Federal Circuit has recognized that filing a terminal disclaimer is not an

22  admission of obviousness.  *Ortho Pharm. Corp.*, 959 F.2d at 941.  Indeed, as the Federal Circuit

23  stated: "the filing of a terminal disclaimer simply serves the statutory function of removing the

24  rejection of double patenting, and raises neither presumption nor estoppel on the merits of the

25  rejection."  *Quad Envtl. Technologies Corp. v. Union Sanitary Dist.*, 946 F. 2d 870, 874 (Fed.

26  Cir. 1991).  Thus, Nee's decision to include terminal disclaimers rather than dispute the PTO

27  examiner's filings cannot establish, as a matter of law, that the patents are obvious or so similar

28  that they are effectively the same invention as that embodied in the '889 Patent.

29

1    DADC further notes that, in licensing Target's patents, Nee and Target "bundled together

2    all of the patents" and taken royalties for any optical disc using an alloy with at least 60% silver.

3    The fact that Nee includes all of his patents in one licensing package does not establish that they

4    are all the same invention.  It is clear that the patents relate to the same subject matter and are

5    similar in that each involves silver alloys with certain characteristics.  But this does not answer

6    the question of whether they are so substantially similar to comprise the same invention or a

7    "slight improvements" on the same invention.

8         Finally, both DADC and Target and Nee have compared the claims in the March 30, 1998

9    Disclosure, the '889 Patent, and the subsequent patents.  DADC contends that the fact that some

10   portion of the claims are the same in each patent demonstrates that the patents relate to the same

11   invention.[6]  Indeed, Target's expert witness admitted that many of the patents shared claims with

12   the '889 Patent and the March 30, 1998 disclosure.  However, as Target has demonstrated, every

13   subsequent patent had claims patentable over the '889 Patent except the '811 and '503 Patents.

14   The new, patentable claims were the majority of claims in each of the subsequent patents except

15   in the '402 Patent.  Further, in 12 of the 17 patents issued after the '889 Patent, all of the claims

16   were patentable over the '889 Patent.  This provides a stark contrast from *Richardson*, 868 F.2d

17   at 1249, where the patent contained only one claim above those unlawfully obtained from the

18   plaintiff.  Accordingly, the Court cannot conclude, as a matter of law, that the subsequent patents

19   were only a slight improvement over the '889 Patent.[7]

20        Because a genuine issue of material fact exists as to whether the subsequent patents were

21   the same invention as that embodied in the '889 Patent or mere slight improvements of that

22   invention, summary judgment on this point is inappropriate.

23

24        [6] DADC supports its argument with the fact that typically a single patent refers to

25   only one invention.  *See* 35 U.S.C. § 101.  However, this does not suggest that all patents
     that share one or more claims are the same invention.

26

27        [7]In addition to having distinct claims, Target's experts testified that many of the
     patents contained distinct alloys from those contained in the March 30, 1998 Patent

28   Disclosure and the '889 Patent.

#### D.    Conclusion

The Court finds that genuine issues of material fact still exist as to three questions: 1) whether Nee was covered by the DADC employment agreement when he developed the invention embodied in the March 30, 1998 Patent Disclosure; 2) whether the March 30, 1998 Patent Disclosure describes the same invention as the '889 Patent or whether the '889 Patent is merely a "slight improvement" over the March 30, 1998 Patent Disclosure; and 3) whether the subsequent patents are the same invention as the '889 Patent or mere slight improvements thereon.

Accordingly, summary judgment in favor of DADC is inappropriate.

### III.    THE WILLIAMS DEFENDANTS' MOTION FOR RECONSIDERATION

In its February 6, 2007 Order, this Court denied the Williams Defendants' Motion for Summary Judgment on the issue of standing.   February 6, 2007 Order at 12-18.  The Williams Defendants argued that Sony, rather than Target, owned the '503 Patent and, thus, Target lacked standing to sue for infringement.  The Court identified the three genuine issues of material fact referenced above: 1) whether the January 1992 Agreement covered Nee's work for DADC from 1995 to 1998; 2) whether the "invention" described in the March 30, 1998 letter was the same as that identified in the '889 Application; and 3) the relationship between the '889 Patent and the '503 Patent. *Id.*  Accordingly, the Court denied summary judgment.

The Williams Defendants now move for reconsideration, concurrently with Sony's Motion for Summary Judgment, claiming that "a wealth of evidence has emerged" to prove that Sony owns the '889 and '503 Patents.  The Williams Defendants specifically identify four categories of facts that have allegedly emerged since the Court's February 6, 2007 Order: 1) Nee's admission that DADC paid part of his salary, gave him benefits, provided airfare to him and his family, kept his name in the DADC organization, and offered him a position at DADC, while he was employed at SDT; 2) documents to corroborate the above admissions, including W-2 and benefits forms from DADC; 3) Nee's admission that work he did in Japan was designed to benefit DADC; and 4) Nee's admission that material in the March 30, 1998 Patent Disclosure provided support for many of the claims in the '889 Patent.  Further, the Williams

1  Defendants incorporate Sony's Motion for Summary Judgment, and the arguments and evidence

2  therein.

3      Initially, the Court notes that it is improper for the Williams Defendants to rely on Sony's

4  Motion for Summary Judgment to support their Motion for Reconsideration.  A Motion for

5  Reconsideration is not an opportunity to raise issues that were not raised in a parties initial

6  motion.  *See* L.R. 7-18 (reconsideration justified based on "a material difference in fact or law

7  from that presented to the Court before such decision *that in the exercise of reasonable diligence*

8  *could not have been known* to the party moving for reconsideration at the time of such decision. .

9  ..") (emphasis added).  The Williams Defendants are not entitled to a second bite at the apple.

10     Further, because genuine issues of material fact remain as described above,

11 reconsideration in light of Sony's Motion would not change the disposition of the Williams

12 Defendants' Motion.

13     As to the first genuine issue of material fact – whether the January 1992 Agreement

14 governed Nee's employment from 1995 to 1998 – the Williams Defendants have identified no

15 new facts that would call into question the Court's prior ruling.  The Court expressly considered

16 the fact that DADC paid a portion of Nee's salary and provided him benefits.  Further, as

17 evidenced by the parties' briefing on the Sony MSJ, a dispute remains as to the significance of

18 Nee's work for DADC on his "home trips."  Finally, although Nee's work may have benefitted

19 DADC in some sense, this is insufficient to show as a matter of law that he was subject to the

20 January 1992 Agreement.  Accordingly, a genuine issue of material fact exists as to whether the

21 January 1992 Agreement governed Nee during his employment from 1995 to 1998.

22     The second issue – whether the invention identified in the March 30, 1998 letter was the

23 same as that disclosed in the '889 Patent – is still subject to a genuine issue of material fact.  As

24 discussed above, the undisputed evidence shows that the '889 Patent contains 108 alloy formulas

25 not identified in the March 30, 1998 Patent Disclosure.  Further, although the '889 Patent and

26 the March 30, 1998 Disclosure contain a number of similar formulas and Nee admitted that the

27 March 30, 1998 Disclosure provided the basis for "many" of the formulas in the '889 Patent, a

28 triable issue of fact exists as to whether the two are so similar that the '889 Patent can be said to

reflect the same invention as the March 30, 1998 Patent Disclosure or a slight improvement thereon.  Indeed, Nee testified that, after seeing the Florczak patent, he had to scrap many of the formulas contained in the March 30, 1998 Disclosure.  Thus, neither DADC nor the Williams Defendants are entitled to summary judgment on this issue.

Finally, as to the third genuine issue of material fact – the relationship between the '889 Patent and the '503 Patent – the Williams Defendants have submitted absolutely no new evidence that would resolve this issue.

In sum, nothing in the Williams Defendants' Motion provides a good basis for the Court to reconsider its prior order.

Accordingly, the Williams Defendants' Motion is hereby DENIED.

### DISPOSITION

For the reasons identified above, the Court hereby DENIES Target and Nee's Motion for Summary Judgment, DENIES Sony's Motion for Partial Summary Judgment, and DENIES the Williams Defendants' Motion for Reconsideration.

IT IS SO ORDERED.

DATED: November 21, 2008

_____
DAVID O. CARTER
United States District Judge